Opinión disidente emitida por el
Juez Asociado Señor Mar-tínez Torres,
a la cual se unen la Jueza Asociada Señora Pabón Charneco y los Jueces Asociados Señor Rivera García y Señor Feliberti Cintrón.
El presente caso exige que determinemos si un convicto por reincidencia habitual al amparo del Código Penal de 1974, Ley Núm. 115 de 22 de julio de 1974, puede cumplir parte de su condena fuera de la custodia máxima a la que se le condenó bajo el estatuto derogado. En esta ocasión, se plantea la controversia a la luz de la Ley de Mandato Constitucional de Rehabilitación, Ley Núm. 377-2004. 4 L.P.R.A. see. 1611 et seq. Por entender que la Ley de Man-dato Constitucional de Rehabilitación no enmendó el Art. *635 62 del Código Penal de 1974, disiento respetuosamente de la Opinión mayoritaria. Entiendo que la postura que hoy adopta este Tribunal sienta las bases para que eventual-mente se declare inconstitucional la custodia máxima, fin ajeno al verdadero propósito de la Ley de Mandato Consti-tucional de Rehabilitación.
I
El 2 de mayo de 1991, al Sr. Jacinto López Borges se le encontró culpable por violación del Art. 173 del Código Penal de 1974 (robo), 33 L.P.R.A. see. 4279 (ed. 2001), y violación del Art. 4 de la Ley de Armas de 1951, 25 L.P.R.A. see. 414 (ed. 1999). Se le sentenció a la pena de separación permanente de la sociedad bajo custodia máxima tras declarársele reincidente habitual el 4 de junio de 1991, conforme a los Arts. 61 y 62 del Código Penal de 1974, 33 L.P.R.A. sees. 3301-3302. Además, se le sentenció a 6 me-ses de prisión que cumpliría concurrentemente con la con-dena perpetua, por la violación a la Ley de Armas. De su condena a perpetuidad por la declaración de reincidencia habitual, tiene que cumplir en prisión, como mínimo, hasta el 15 de octubre de 2020.
En prisión, recibió tratamiento contra la adicción, ter-minó el cuarto año de escuela superior y ha trabajado en el área de empaque. No se han presentado querellas ni cele-brado vistas disciplinarias en su contra.
El 10 de diciembre de 2008 el Comité de Clasificación y Tratamiento del Anexo 296 de Guayama ratificó que el se-ñor López Borges permaneciera en custodia máxima. Para llegar a esa conclusión, descansó en lo que dispone el Art. 62 del Código Penal de 1974, supra, al amparo del cual se le declaró reincidente habitual.
El señor López Borges apeló la determinación ante la Supervisora de la Oficina de Clasificación, quien denegó revisar la decisión el 19 de diciembre de 2009. Nueva- *636 mente, se atendió a lo que disponía el Código Penal de 1974 sobre la reincidencia habitual.
Inconforme, el señor López Borges acudió al Tribunal de Apelaciones. Allí planteó que la Ley de Mandato Constitu-cional de Rehabilitación permite que un convicto por rein-cidencia habitual pueda cumplir su condena bajo un tipo de clasificación diferente al de custodia máxima. Según el convicto, esta ley tuvo el efecto de enmendar el Código Penal de 1974, unos meses antes de que entrara en vigencia el Código Penal actual.
El Tribunal de Apelaciones, en una votación dos a uno([1]) dio la razón al confinado el 14 de mayo de 2010. Concluyó que la Ley de Mandato Constitucional de Rehabilitación aplica a todos los confinados, incluso aquellos que fueron convictos con anterioridad a la aprobación del estatuto. Interpretó que la ley no hizo excepción al estable-cer un mecanismo de reevaluación de confinados y, por con-siguiente, hizo viable que los convictos habituales al am-paro del anterior Código Penal pudieran ser merecedores de que se les rebajara el nivel de seguridad.
El foro apelativo intermedio devolvió el caso al Comité para que reevaluara al señor López Borges sin que se to-mara en consideración el requisito del Art. 62 del Código Penal derogado, que requería separación permanente en una prisión de máxima seguridad para los reincidentes habituales.
Inconforme, la Administración de Corrección recurre ante nos. En esencia, plantea que el Tribunal de Apelaciones erró al aplicar la Ley de Mandato Constitucional de Rehabilitación a un declarado reincidente habitual al amparo del Código Penal de 1974 y, de esta forma, concederle la posibilidad de reducir de máxima el nivel de seguridad en que está confinado. Argumenta que el Tribunal de Ape- *637 ¡aciones aplicó erróneamente el principio de favorabilidad que recoge el Art. 9 del Código Penal de 2004, 33 L.P.R.A. see. 4637.
El 28 de enero de 2011 expedimos el auto. Ambas partes comparecieron.
II-A
El Código Penal de 197, al igual que el Código Penal vigente, establecía tres grados de reincidencia para las per-sonas convictas en más de una ocasión: reincidencia, rein-cidencia agravada y reincidencia habitual.
En cuanto a la reincidencia habitual, que es la que con-cierne a este caso, el Art. 61 del Código Penal de 1974, supra, establecía que se constituía cuando
... el que ha sido convicto y sentenciado por dos o más delitos graves cometidos en tiempos diversos e independientes unos de otros cometiere posteriormente cualquiera de los siguientes delitos o sus tentativas: asesinato, robo, incesto, extorsión, vio-lación, sodomía, actos lascivos o impúdicos cuando la víctima fuere menor de catorce (14) años, secuestro, agresión agravada en su modalidad grave, escalamiento agravado, apropiación ilegal agravada de vehículos de motor o sus partes, incendio agravado, sabotaje de servicios públicos esenciales, fuga cuando la persona está cumpliendo sentencia firme o en trá-mite de apelación por un delito grave, cualquier delito grave en violación [a la Ley de Explosivos de Puerto Rico, Ley Núm. 134 de 28 de junio de 1969] y a la Ley contra el Crimen Orga-nizado, [Ley Núm. 33 de 13 de junio de 1978,] violación a [los artículos 401, 405 y 411(a)] de la Ley de Sustancias Controla-das de Puerto Rico, [Ley Núm. 4 de 23 de junio de 1971 o a los artículos 5 y 8(a) de la Ley de Armas de Puerto Rico, Ley Núm. 17 de 19 enero de 1951, según enmendada], así como también cualquier conspiración por la comisión de estos delitos y sus tentativas.
El Art. 62(c) del Código Penal de 1974, supra, anterior advertía que aquellos declarados reincidentes habituales recibirían una sentencia de separación permanente de la sociedad, mediante reclusión perpetua, a cumplirse en una *638 institución especializada de seguridad máxima. De esta forma, ese artículo hizo una excepción expresa a la Ley Orgánica de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974, para retirarle a la agencia la discreción de determinar la institución en que los reinci-dentes habituales cumplirían su condena.
En caso de reincidencia habitual el convicto será declarado por el tribunal delincuente habitual y será sentenciado a separa-ción permanente de la sociedad mediante reclusión perpetua. No obstante lo dispuesto en [la Ley Núm. 116 de 22 julio de 1974, según enmendada], en cuanto a la facultad de la Admi-nistración de Corrección para determinar las instituciones en que habrá de ser ingresada o trasladada la clientela del sis-tema correccional, el convicto que sea sentenciado a separa-ción permanente cumplirá todo el término de reclusión en una institución especializada de máxima custodia y la Administra-ción de Corrección proveerá a este tipo de delincuente todos los servicios y programas en la propia institución, incluyendo aquellos que propendan a su rehabilitación. Art. 62(c) del Có-digo Penal de 1974, supra.
Así, una vez la Administración de Corrección recibía la custodia de un reincidente habitual, no tenía más opciones al amparo del Código Penal de 1974 que ubicarlo en custo-dia máxima. A pesar de ello, se proveían todos los servicios y programas dirigidos a la rehabilitación del confinado.
El Art. 81(c) del Código Penal de 2004, Ley 149-2004, 33 L.P.R.A. sec. 4709(c), se limita a imponer una condena de 99 años al convicto por reincidencia habitual. No dispone acerca de que la condena deba cumplirse bajo una custodia de seguridad máxima. Sin embargo, el Código Penal vi-gente tiene una cláusula de reserva, en su Art. 308, 33 L.P.R.A. see. 4935, que específicamente señala que las con-ductas realizadas con anterioridad a la vigencia del esta-tuto se regirán por las leyes vigentes al momento del hecho. La única excepción abarca aquellos casos en que se haya suprimido el delito que tipifica la conducta cometida. En esas instancias se sobreseerán los casos pendientes y se declararán nulas las sentencias condenatorias.
*639 Nuestra interpretación de esta cláusula de reserva ha impedido la aplicación del Código Penal de 2004 a delitos cometidos antes de que comenzara su vigencia, el 1 de mayo de 2005. Pueblo v. González, 165 D.P.R. 675 (2005). Véanse, además, las Resoluciones emitidas en Pueblo v. Negrón Rivera, 183 D.P.R. 271 (2011), y en Pueblo v. Padín Rodríguez, 169 D.P.R. 521 (2006).
B
La Constitución de Puerto Rico, Art. VI, Sec. 19, esta-blece como política pública del Estado Libre Asociado
... reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recur-sos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social. Art. VI, Sec. 19, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 440.
Esa expresión de política pública estaba condicionada a los recursos disponibles por parte del Estado. En el 2004 se aprobó la Ley de Mandato Constitucional de Rehabilita-ción para establecer que el Gobierno cuenta con los recur-sos económicos para hacer viable el mandato de rehabilita-ción que recogió la Constitución en 1952.
La Ley de Mandato Constitucional de Rehabilitación se aprobó como parte de un paquete de más de treinta leyes que constituyeron la Reforma Penal de 2004. R.N. Bell Bayrón, La significativa aportación al compromiso con la rehabilitación del sentenciado de la Reforma Penal del 2004 y de la Ley del Mandato Constitucional de Rehabilitación, 40 Rev. Jur. U.I.P.R. 1 (2005). La ley se aprobó el 16 de septiembre de 2004, tres meses después que el Código Penal de 2004. Sin embargo, entró en vigencia aproximadamente ocho meses antes de que empezara a regir ese Código Penal, vigente hoy.
El estatuto requiere que las agencias gubernamentales relacionadas al sistema de corrección pongan en ejecución *640 programas de rehabilitación y de reinserción que impacten a toda la población sentenciada. (Enfasis nuestro). Art. 3, 4 L.P.R.A. see. 1611. Además, requiere
(a) Clasificación adecuada de la población correccional y revi-sión continua de esta clasificación conforme a los ajustes y cambios de la clientela. Esta clasificación se efectuará por equipos multidiseiplinarios que laborarán en las propias ins-tituciones penales o, en estrecha relación con los programas comunitarios que participen voluntariamente en este esfuerzo.
(g) Diseño y desarrollo de programas y parámetros de medi-ción para asegurar que el proceso de rehabilitación esté enfo-cado hacia el cambio en los patrones de conducta conducentes a la actividad delictiva por la cual se cumple sentencia. (Enfa-sis nuestro). Id.
Esa ley también dispuso en su Art. 7, 4 L.P.R.A. sec. 1615, un procedimiento para que, bajo ciertas circunstan-cias, un convicto por delito grave pueda obtener certifica-ción de rehabilitación por parte del Departamento de Co-rrección y Rehabilitación. Con esa certificación, el convicto podría solicitar a los tribunales que den por cumplida la sentencia que enfrenta.
El Manual para Crear y Definir Funciones del Comité de Clasificación de Confinados, Reglamento Núm. 7334 de 10 de abril de 2007, canaliza la concesión de las Certifica-ciones de Rehabilitación. Este manual impide que una persona que haya sido convicta en dos ocasiones o más pueda cualificar para el beneficio. Id., pág. 7.
Por otro lado, el Manual de Clasificación de Confinados de la Administración de Corrección, Reglamento Núm. 6067 de 22 de enero de 2000, instrumentaliza la reclasifi-cación de los confinados. Este reglamento está vigente a pesar de que se aprobó antes de que entrara en vigor la *641 Ley de Mandato Constitucional de Rehabilitación.([2]) El manual señala en su Introducción que
... la clasificación de los confinados consiste en la separación sistemática y evolutiva de los confinados en subgrupos, en vir-tud de necesidades de cada individuo, y las exigencias y nece-sidades de la sociedad, que continúa desde la fecha de ingreso del confinado hasta la fecha de su excarcelación. Además de satisfacer las necesidades del confinado, el proceso de clasifi-cación coordina la custodia física de los confinados con los programas y recursos disponibles dentro del sistema correccio-nal ... para lograr un sistema de clasificación funcional, el proceso tiene que ubicar a cada confinado al programa y el nivel de custodia menos restrictivo posible para el que cualifi-que, sin menoscabar la seguridad y las necesidades de la so-ciedad, de los demás confinados, y del personal correccional. (Énfasis nuestro). Manual de Clasificación de Confinados, id., pág. 1.
La Sección 1 del Manual de Clasificación de Confinados, que contiene las Definiciones Claves y Glosario de Térmi-nos, hace un reconocimiento expreso de los efectos de una sentencia de reincidencia habitual declarada al amparo del Código Penal de 1974. Específicamente indica que los declarados delincuentes habituales serán ingresados o trasladados a una institución de seguridad máxima. ([3]) Manual de Clasificación de Confinados, supra, pág. 3.
Además, el Manual de Clasificación de Confinados define que la reclasificación es la “[r]evisión periódica de los confinados en lo que respecta a su progreso como parte del Plan Institucional, así como también su categoría de custodia”. Manual de Clasificación de Confinados, supra, *642 pág. 8. Al mismo tiempo, el Plan Institucional es “[u]na evaluación escrita de las necesidades de cada confinado en lo que respecta a programas y servicios, y las actividades programadas que se recomiendan para llenar esas necesidades”. Manual de Clasificación de Confinados, supra, pág. 8.
En el inciso del Manual de Clasificación de Confinados que señala los objetivos de la reclasificación de custodia se reconoce que este proceso
... no necesariamente tiene como resultado un cambio en la clasificación de custodia o la vivienda asignada. Su función principal es supervisar la adaptación del confinado y prestarle atención a cualquier situación pertinente que pueda surgir. (Énfasis nuestro). Manual de Clasificación de Confinados, id., pág. 39.
III
Contra el señor López Borges pesa una sentencia de reincidencia habitual, impuesta al amparo del Código Penal de 1974. Acorde con lo que disponía el estatuto, se le condenó a cumplir su cadena perpetua en una institución de máxima seguridad.
Tras cumplir 17 años en prisión, solicitó continuar su confinamiento en una prisión con un nivel menor de custo-dia, al amparo de la Ley de Mandato Constitucional de Rehabilitación. El Tribunal de Apelaciones acogió su plan-teamiento de que esta ley enmendó el Código Penal de 1974. De esta manera, el foro apelativo intermedio con-cluyó que los declarados reincidentes habituales al amparo del Código Penal de 1974 no tendrían que extinguir su con-dena en una prisión de máxima seguridad. Sin embargo, el análisis de la ley en la que se amparó el confinado, y de los reglamentos mediante los cuales se instrumentaliza, nos lleva a una conclusión diferente a la que llegó el Tribunal de Apelaciones y la mayoría de este Tribunal.
Si bien es cierto que la Ley de Mandato Constitucional *643 de Rehabilitación extiende su aplicación a “todos los confi-nados”, eso no necesariamente conlleva una reducción en el nivel de seguridad en que se custodia al evaluado. Entre los propósitos de la Ley de Mandato Constitucional de Re-habilitación se encuentra declarar como política pública que el Estado cuenta con los recursos para cumplir con la aspiración de rehabilitación que se recogió en el Art. VI, Sec. 19, de la Constitución de Puerto Rico, supra. Además, se describe un sistema para la rehabilitación del confinado que incluye, en su Art. 3, supra, una “clasificación ade-cuada de la población correccional”. (Enfasis nuestro). También la ley crea un comité de ciudadanos para contri-buir en su implementación. Por último, se proveyó para la expedición de certificaciones de rehabilitación mediante las cuales los tribunales pueden dar por cumplida la sen-tencia de convictos por delitos graves, bajo ciertas circunstancias.
La reclasificación es parte del proceso de rehabilitación. Si bien es cierto que una fase de la reclasificación va diri-gida a analizar el nivel de custodia en que debe estar el confinado, ese no es el único propósito de este proceso. La reclasificación también tiene el propósito de evaluar el avance del confinado en el Plan Institucional establecido. Este plan va dirigido a ubicar al confinado en programas, servicios y actividades.
Es decir, el hecho de que la ley provea para que todos los confinados se reclasifiquen regularmente no implica que se tenga que considerar un cambio en su nivel de custodia. Esa reclasificación también cumple el propósito de identi-ficar los mejores programas y servicios que las circunstan-cias de la sentencia impuesta le permitan recibir al confinado.
Esto se hace patente en el Manual de Clasificación de Confinados, que entre sus objetivos reconoce que el resul-tado del proceso de reclasificación no necesariamente sig-nifica un cambio en el nivel de custodia del confinado puesto que “su función principal es supervisar la adapta- *644 ción del confinado y prestarle atención a cualquier situa-ción pertinente que pueda surgir”. (Enfasis nuestro). Manual de Clasificación de Confinados, supra, pág. 42.
Además, el Manual de Clasificación de Confinados hace un reconocimiento expreso de los efectos de la reincidencia habitual sobre las condiciones en que el confinado debe extinguir su pena. Reitera que debe cumplirla en una ins-titución de seguridad máxima.
El confinado plantea que si la ley pretendía hacer una excepción con los declarados reincidentes habituales debía hacerse constar de manera expresa. Su argumento no me convence porque era innecesaria una excepción. Como ve-mos, el cumplimiento con las condiciones de su condena no es incompatible con lo que dispone la Ley de Mandato Constitucional de Rehabilitación. El es merecedor, y lo ha sido, de que se le reclasifique regularmente. Sin embargo, eso no equivale a que se le cambie el nivel de custodia al que se le condenó. Nada en la ley conduce a esa conclusión.
La Ley de Mandato Constitucional de Rehabilitación exige solamente que se clasifique a cada confinado adecuadamente. No ordena, como interpreta la mayoría, a que se le reclasifique en un nivel de custodia para el que no cualifica según la ley que lo llevó a la cárcel. La clasifica-ción adecuada y el nivel de custodia menos restrictivo po-sible para el que cualifica el Sr. López Borges es la custodia máxima. Con esto no se vulnera su derecho a la rehabilitación. El puede participar de los programas y ser-vicios que la Administración de Corrección provee en la institución en que está confinado, mientras cumple el tiempo requerido en prisión.
De la misma forma, su sentencia como delincuente habitual le impide recibir una certificación de rehabilitación, conforme el Art. 7 de la Ley de Mandato Constitucional de Rehabilitación, supra. Este beneficio está disponible para aquellos sentenciados por delito grave. El hecho de que una sentencia por delincuencia habitual implique la comi- *645 sión, no de uno, sino de varios delitos graves cometidos en diferentes instancias, lo excluye del manto del beneficio. El Manual para Crear y Definir Funciones del Comité de Cla-sificación de Confinados así lo reitera: “Queda claro que para ser elegible, el sentenciado debe cumplir con las nor-mas establecidas en el Código Penal y los requisitos que se establezcan mediante reglamento ...”. Bell Bayrón, supra, pág. 10. Para llegar a esta conclusión es innecesario entrar en el análisis de la cláusula de reserva del Código Penal de 2004, asunto que ya hemos atendido en jurisprudencia previa.
La rehabilitación de los confinados es un mandato del Art. VI, Sec. 19, de la Constitución de Puerto Rico, supra. La ley que interpretamos hoy tiene el propósito de viabili-zar ese mandato. Lamentablemente, este Tribunal re-suelve que la custodia máxima es incompatible con el pro-pósito rehabilitador de nuestro sistema carcelario, viabilizado por la Ley de Mandato Constitucional de Rehabilitación. La consecuencia inevitable de este razona-miento es la eventual declaración de inconstitucionalidad de la custodia máxima, como elemento carcelario contrario al concepto de rehabilitación que hoy definimos. Con esto, condenamos a nuestra sociedad a perder otra herramienta disuasiva contra los criminales.
IV
Por los fundamentos expuestos, disiento respetuosa-mente de la Opinión mayoritaria, y revocaría al Tribunal de Apelaciones.

(1) La Sentencia del Tribunal de Apelaciones Jacinto López Borges v. Administración de Corrección, KLRA2009-258, contó con el voto a favor de los jueces Aponte Hernández y Cabán García. El juez Escribano Medina escribió un voto disidente.

(2) Aunque la Administración de Corrección ha aprobado dos manuales de cla-sificación luego del Reglamento Núm. 6067, ninguno está vigente actualmente. El Reglamento Núm. 7062 de 30 de noviembre de 2005 y el Reglamento Núm. 7295 de 14 de febrero de 2007 están inactivos a raíz de una orden del Tribunal Federal para el Distrito de Puerto Rico en el caso Morales Feliciano v. Fortuno Burset, Civil Núm. 79-4.

(3) Este reconocimiento permaneció intacto en los reglamentos posteriores, que no están vigentes, es decir, en el Reglamento Núm. 7295 y en el Reglamento Núm. 7062.